June 1820.

Mercer
vs.
Walmsley.

---

COURT OF APPEALS, (E. S.) JUNE TERM, 1820.

### Mercer *vs.* Walmsley.

APPEAL from *Cecil* county court. This was an action on the case, brought by the appellee against the appellant. The declaration stated—"That whereas the said *John Mercer* contriving, and wrongfully and unjustly intending, to injure the said *William Walmsley,* and to deprive him of the service and assistance of *Margaret Walmsley,* the daughter and servant of him the said W. heretofore, to wit, on the 1st day of July 1816, and on divers other days and times between that day and the day of issuing forth the original writ in this cause, at *Cecil* county aforesaid, debauched and carnally knew the said M. then and there,

*An action on the case per quod servitium amisit, will not lie by a father for the seduction of his daughter, where she is above the age of 21, and not in his actual employment—Otherwise where she is under that age.*

*Where a daughter, either of age or under age, is seduced in the father's house, he may maintain either an action of trespass q. c. fregit, and lay the seduction and loss of her service, as consequential, or an action on the case against the seducer.*

Where a daughter is above 21, very trifling acts of service are sufficient evidence of her being in fact his servant.

Whether a father can support an action *per quod servitium,* &c. where the daughter is above age, without proving some acts of service? *Quere.*

Where the evidence is all on one side the court have a right to say that it is not sufficient to entitle the party to a verdict.

A father, *as such only,* cannot maintain an action *per quod servitium amisit,* for the seduction of his daughter.

Whether a father may not bring this action for the seduction of his daughter, under age, although she does not reside with him, and has no intention of doing so, and although such intention is known and assented to by the father? *Quere.*

and from thence, for a long space of time, to wit, hitherto being the daughter and servant of the said W. whereby the said M. became pregnant, and sick with child, and so remained and continued for a long space of time, to wit, for the space of nine months then next following; at the expiration whereof, to wit, on the 7th day of April 1817, at *Cecil* county aforesaid, the said M. was delivered of the child with which she was so pregnant as aforesaid; by means of which said several premises, she the said M. for a long space of time, to wit, from the day and year first above mentioned, hitherto became and was unable to do or perform the necessary affairs and business of the said W. so being her father and master as aforesaid, and thereby he the said W. during all that time, lost and was deprived of the service of said daughter and servant, to wit, at *Cecil* county aforesaid; and also by means of the said several premises he the said W. was forced and obliged to, and did necessarily pay, lay out and expend, divers sums of money, in the whole amounting to $500, in and about the nursing and taking care of his said daughter and servant, and in and about the delivery of the said child, to wit, at *Cecil* county aforesaid. Wherefore the said W. saith he is injured," &c. The defendant pleaded not guilty, and issue was joined.

At the trial of the cause, the plaintiff to support the issue on his part, produced *Margaret Walmsley,* his daughter, who proved, that some time in the year ——, her father sent her to the defendant's house to live; that upon her arrival there the defendant told her he had promised her father she should live with him as long as she lived, that he was better able to maintain her than her father was. That she had been at the defendant's more than a year before he spoke indelicately to her. That she usually slept in the room with the defendant's daughter, Mrs. *Davis,* but her bed in that room being occupied some time in the month of July 1816, she went to bed in an adjoining room. That during the night, the defendant came into her room, whilst she was asleep, and got into bed with her. That she made resistance, but he stopped her mouth with the sheet, and succeeded in having criminal knowledge of her. That he afterwards lay a considerable time in bed with her, without her making any noise or attempt to alarm the family. That he promised to marry her, or forfeit all he was worth in the world. That whenever Mrs. *Davis* was away, she

did not sleep in the defendant's house except on two occasions, both of which happened after the criminal connexion. That she will be 25 years of age on the 1st of April 1819; and lived in the defendant's house near three years, and left it five months after she became pregnant. Before she went to the defendant's house to live, she had been living first at a Mr. *Porter's* when she was between 14 and 15 years of age; and after staying there some time, returned to her father's house. Some time afterwards she went to live with Mrs. *Savin*, from thence she again returned to her father's, and then went to live at *Gideon Longfellows*, where she continued a few weeks before she went to live at the defendant's. Upon going to the defendant's to live, she made no contract for wages, but after she had been there some time, the defendant gave her money, and told her, whenever she wanted any to tell him and he would give it to her. That she did frequently ask him, and he always gave her money, That she also received money once from her father, whilst she lived with the defendant, and occasionally got articles out of two different stores, in which she had a credit on her father's account. That whilst she lived in the family of the defendant, she knit, spun and sewed, and attended to house keeping affairs generally. That she always conceived herself at liberty to leave the family of the defendant whenever she might choose so to do; and frequently went to her father's on a visit, and to help them, when they had a press of work; and once went to nurse her step-mother, who was ill. That after the act of criminal connexion, the defendant sent her to a Mr. *Williams*, in *Delaware*, where she was delivered of a child; and while there, her brother came to her, and told her, that her father had provided a home for her; but she did not go; and shortly afterwards the defendant came and carried her from *Williams's* to *Wilmington*, and from thence she went, at his instance, to *Philadelphia.* At leaving *Wilmington*, the defendant gave her three dollars. She did not know that her father was apprised of her removal from Mr. *Williams's*, or the place to which she went. On her arrival in *Philadelphia*, she went to Mrs. *Fisher's*, and remained there a short time, when her father sent for her, and she went with his messenger to the house of a relation of her's, where she has remained ever since. That she would have returned to her father's house, had Mrs. *Davis* either

June 1820. died or removed, at any time whilst she lived there. The
defendant never had connexion with her but once whilst
she lived with him; and she never had connexion with any
other person. That each time she returned to her father's
house, it was to stay there until she got another place; and
she does not know that her father has been at any expense,
or paid any money on account of her sickness or lying in.
That she was delivered of the child on the 7th of April
1817, at Mr. *Williams's*, where the defendant had sent her.
The first advances made by the defendant, was about a
year after she first went to reside at his house, and he made
repeated advances between that time, and the time he suc-
ceeded. That the reasons why she did not quit the defen-
dant's house, after he had made those proposals to her,
were that he persuaded her not to remove from his house,
and continue to respect his promise to marry her. That
she did not consider herself authorised to demand, nor did she
expect to recover pecuniary compensation for any services
rendered by her in the family of the defendant; nor did
she consider the defendant bound to pay her; and that she
considered the money given to her by the defendant, as a
gift made to her by him in consequence of the services she
had rendered about the house. The plaintiff here rested
his case; and the defendant then prayed the court to direct
the jury, that the evidence produced by the plaintiff was
not sufficient to entitle him to recover. Which opinion
the court [*Earle*, Ch. J. *Purnell* and *Worrell*, A. J.] re-
fused to give. The defendant excepted. Verdict and
judgment for $6000 current money, damages, and costs.
The defendant appealed to this court.

The cause was argued in this court before Buchanan,
Johnson and Dorsey, J. by

Gale and Cosden, for the appellant, (a) and by

Chambers and Carmichael, for the appellee. (b)

Buchanan, J. delivered the opinion of the court.

*(a)* They cited 1 *Chitty*, 47. 5 *East*, 45. 2 *T. R.* 166. 10
*Johns. Rep.* 115. *Ld. Raym.* 1032. 5 *Bos. & Pull.* 476.

*(b)* They also cited 2 *T. R.* 166. 5 *East*, 47. 3 *Burr.* 1878.
10 *Johns. Rep.* 115. *Doug.* 119. 2 *H. Blk. Rep.* 187. 4 *Harr.
& M'Hen.* 547. 3 *Wils.* 47. 4 *Cranch*, 71. 8 *Johns. Rep.* 495,
496, 505. 9 *Johns. Rep.* 387.

Margin note: Mercer vs. Walmsley.

The objection, that an action on the case will not lie by a father for debauching and getting his daughter with child, *per quod servitium amisit*, cannot be maintained either on principle or authority. Where a man illegally enters the house of another, and debauches his daughter, the father may have an action of trespass *quare clausum fregit*, and lay the debauching of his daughter, and loss of her services as consequential; or he may at his election, bring an action on the case for debauching his daughter, *per quod servitium amisit;* but for merely debauching a man's daughter, unaccompanied by an unauthorised entry into the father's premises, the action is case, and the loss of service is the gist of the action.

The only question, therefore, in the case before us is, whether the evidence exhibited in the bill of exceptions is such as to enable the plaintiff to recover? and we clearly think that it is not. *Margaret Walmsley*, the daughter, the only witness examined at the trial, was produced by the father himself, and from his own shewing it appears that she was upwards of twenty-one years of age, was not his servant *de facto*, and did not live with him at the time she was debauched; but that she was living at the house of the defendant, where she had lived more than a year, doing different descriptions of work, and attending to the affairs of the family generally.

A father may maintain an action for debauching his daughter when under age, *per quod servitium amisit*, whether she was living with him at the time the offence was committed or not; for from the legal controul he had over her services, the law implies the relation of master and servant, unless in the case of her not living with him he had, by some act of his own, destroyed that relation. She is his servant *de jure*, and by debauching her an act is done that deprives him of services, which he might have exacted. In the case of *Dean vs Peel*, reported in *5th East*, 47, it was held, that the daughter being in the service of another, and having no *animus revertendi*, the relation of master and servant had ceased to exist, and that therefore the father could not maintain the action. But it is much questioned whether merely by her volition a daughter under the age of twenty-one years, can so divest her father of his power to reclaim her services as to affect his right of action. But when a daughter is over the age of 21, and

not in the actual service of her father  when the injury is done, he cannot sustain the action.     And so are all the authorities except the case of *Johnson vs M'Adam*,  cited in the case of *Dean vs Peel.*   In that case the daughter was under the age of 21 when she  left her father's  house,  but attained that  age a  short  time before she  was seduced; and the judge before whom  the cause  was tried, considering it a middle case, saved the point; there was no new trial moved for, and the question  was  never afterwards  decided.    But it appeared in summing up the evidence to the jury, that the  judge went on the ground, that from the circumstances of the case  she might be  considered as  continuing to be a part of her father's family.    If a daughter be living with her  father, and in his  service, though over the age of 21, the action may be sustained, and any  slight service will be sufficient to raise the inference of fact, that she was his servant; as in  the case of *Bennet  vs  Alcott,* *2d Term Rep.* 166, where the  daughter was 30  years old. But where the daughter was  above the  age  of  21,  and in the service of another at the time of  the injury, the action cannot be maintained  by the father.

In this case it is contended  that the daughter was not the servant of  the defendant, there being no contract for wages; but let it be remembered,  that he frequently gave her money in consideration of the services  she  rendered in  his house of a menial nature, and authorised her  to  call  for money whenever she wanted it, and  that she  was living with him at the time; and it is enough to defeat the action that she was not *living* with her father,  but with  another. It is only where a daughter, being above 21, was *living* with her father, that a slight act of service  is held  to  be evidence of her being in fact his servant; and it  is not  like the case of an *infant* daughter,  living  out of her  father's family, where the *law* implies the relation  of master  and servant, for *eo instanter* that the  daughter reaches  the age of 21, the relation of master and servant *de jure* ceases to exist, and the *law* will not imply it.    It  must be  shewn that she was her father's servant *de facto* at the time,  &c. which cannot be when living in the  family  of another, as in this case.

It has been urged in argument, that whether *Margaret Walmsley* was the servant of  her father or not, at the time she was seduced, was a fact proper to be found  by the ju-

ry, and not within the province of the court to decide; and on that ground the refusal of the court to direct the jury, that the evidence produced by the plaintiff was not sufficient to support the issue on his part, is defended. But the principle, that the jury is the proper tribunal to judge of the facts, in a cause that is tried before them, is not applicable to this case, and cannot be brought in aid of the argument. Here the evidence was all on the side of the plaintiff, and the facts on which he rested his case appear in the bill of exceptions. These facts shew that his daughter was more than 21 years old, was not in his family, but living in the house of the defendant, at the time she was debauched. From his own shewing, therefore, it is proved, that she was not in his service at the time of the injury complained of, and the jury could not be left to infer that she was, in direct opposition to the only proof in the cause, and that proof too, produced by himself; there was nothing to be found by the jury. The bill of exceptions exhibits the plaintiff's case, his supposed cause of action; and the question was not a question of fact, whether she was in the service of her father or not, but whether, not being in his service, and above the age of 21, the action could be maintained; which was a sheer question of law for the court to decide; and the law being clear that it could not, the court ought so to have directed the jury.

JOHNSON, J.   A father cannot sustain an action for the seduction of his daughter of *full age, not residing with him;* and it seems doubtful whether the action is maintainable if she is living with him, unless she is in the habit of rendering services to her father; and although they may be inconsiderable, yet they would seem essentially necessary to authorise him to sustain the action.

In the case of 2 *Term. Rep.* 166, where the action was brought for the seduction of the daughter, *per quod servitium amisit,* the daughter was living with the father, she was thirty years of age, and from any thing appearing in the case, never had left her paternal roof. Even those circumstances, it would seem, were inadequate to the maintaining of the action, unless she was in the practice of rendering services to, or working for, the father; which was relied on as the ground of the determination sustaining the action.

*June 1820.*

Mercer
vs.
Walmsley

The foundation of the action *per quod servitium amisit*, is the right of the plaintiff to those services, for the loss of which he claims compensation. For, as for every loss or injury there is a remedy, so also where there is no loss or injury no suit can be sustained. No person can complain and claim a compensation for the loss of services, unless he had a right to those services; and no father can complain in law for the seduction of his daughter of full age, acting for herself, unless the right to the suit depended on the *connexion of father and child*, and if that was of itself sufficient, then it would follow, that a father in all cases could maintain the suit, a position not maintainable.

It is believed that all the cases which have been produced establish incontrovertibly, that the father, as such, is incompetent to maintain the action; and if, as such, he cannot support the claim, another connexion than that of father and child is indispensably necessary.

Where the daughter lives with the father, *rendering services*, that connexion is sufficient, even when she is at the time of the seduction of full age. Where she is a minor, whether residing with him or not, the suit can be sustained, because *he has* a right to her services, and can control her.

In the case of 5 *East*, 47, the daughter, at the time of seduction, was a minor, not residing with the father. There the suit *was not sustained;* the reason given for the opinion *was, because she never* intended to return to the father. I doubt the correctness of that decision, founded on such a reason. For the right of the father to the services of the daughter, during minority, depends not on her. Let her design to leave him be ever so determined, she has no legal right so to do, or when from under his roof, she has no right to form a determination never to return; and if such a determination is made, still the father has a right to compel her return, and have the benefit of her services. Nor is it clear to me, that even with the consent of the father, that she should permanently leave his protection, would the case be materially different; for as no contract between the father and minor daughter would be binding, a stipulation or understanding that she should permanently leave him, and shift for herself, would be nugatory. But that is not the case now before the court. It will be time enough ultimately to determine what *respect* should be paid to the case in

*5 East*, when a similar cause is brought before the court.
I say, what *respect*, for it is no *authority* binding on this
court.

The case in *5 East*, and the case of *Johnson vs. M'Adam*,
were mainly relied on by the appellee in this case. The
case in *East*, as establishing the position, that the *gist of
the action was the animus revertendi*, and that where that
existed, whether the seduction took place while living with
her father or not, whether a minor, or of full age, was
immaterial.

The right to sustain the suit cannot depend on that prin-
ciple. The right of the father to claim a compensation for
the loss of services, must rest on his legal right to those
services; it rests on a more solid foundation than his daugh-
ter's intention.

It may be sufficient to remark, that the case of *Johnson
vs. M'Adam*, was a *nisi prius* decision, made by one
judge only, who undertook to draw a line of discriminati-
on, not warranted, in my opinion, by the previous decisi-
ons. That case could only have been sustained on the
ground of an express or implied contract existing between
the father and daughter, that she would serve him. But
the case of *Johnson vs. M'Adam* is distinguishable
from the case before the court; and if it was not, it cannot
be called an authority obligatory on this court.

The decisions that have taken place in the State of *New
York*, place the action on the correct principle or founda-
tion, that is, the right to the services of the daughter ex-
press or implied; it is believed, on a careful examination, it
will be found that it is the *gist* of the action.

In 10 *Johns. Rep.* 115, the suit could not be sustained,
the daughter having been of full age, and occasionally work-
ing out for wages, although she was in the habit of apply-
ing those wages to the accommodation of her parents.

In a case like that, there must have been every inclina-
tion on the part of the court to sustain the suit, and had
they pursued the course that was adopted in *Johnson vs.
M'Adam*, it would have been described as a *middle* case,
and the action would have been maintained; for by the
same principle that ruled the case before Justice *Wilson*,
the judges of *New York* might have inferred, that as the
daughter was in the habit of applying her wages to the be-
nefit of her father's family, there was an implied agreement

June 1820.

Wickes
vs
Caulk

she should so apply them, and consequently, by the act of the defendant, the father was deprived of her services, and the suit could be sustained. But such was not the decision. It seems to make a material difference in the estimation of the counsel for the appellee, that before the father can be deprived of his claim to services, when the daughter is of age, that some *other* person, under a subsisting contract between him and the daughter, should have a right to them. But it is not necessary, in order to defeat the suit, that that should be the case. If she is a minor, the father rightfully claims; if of age and hired out, the master claims; if of age, not residing with her father, she is her own mistress, and works for herself, and no person can legally complain of being deprived of her assistance.

JUDGMENT REVERSED.